J-S15002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: R.L.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 12 EDA 2022 |

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0002718-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: R.E.L.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 13 EDA 2022 |

Appeal from the Decree Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000352-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: D.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.L., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 14 EDA 2022 |

Appeal from the Order Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000108-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.L.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-S15002-22

                                    :

APPEAL OF: V.L., MOTHER        :

                                    :

                                    :   No. 15 EDA 2022

Appeal from the Decree Entered November 17, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000353-2019

BEFORE: NICHOLS, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                 **FILED JULY 19, 2022**

Appellant V.L. (Mother) appeals from the decrees granting the petitions filed by the Philadelphia County Department of Human Services (DHS) to involuntarily terminate her parental rights to her minor children, R.E.L.-C. (born July 2013) and D.M.L.-C. (born January 2018) (collectively, the Children), and the orders changing the Children's permanency goals to adoption.[1,2] Mother argues that the trial court erred in concluding that DHS presented clear and convincing evidence supporting the termination of her parental rights. We affirm.

---

[1] R.E.L.-C. and D.M.L.-C. are the biological children of Mother and R.C. (Father), and the Children have an older half-sister, R.L. (Sibling), who is Mother's biological child and Father's stepchild. *See* Trial Ct. Op., 1/23/22, at 1; Goal Change Pet., 5/9/19, Ex. A; N.T. Term. Hr'g, 10/1/19, at 11-12, 9/17/21, at 56-57. Sibling has a separate dependency matter and is not included in the instant appeal. N.T. Term. Hr'g, 10/1/19, at 11-12, 134. She is in the permanent legal custody of another caretaker. *Id.*

[2] Father's parental rights to the Children were terminated on the same date. Father filed separate appeals from the goal change orders and the termination decrees, which we will address in a separate memorandum.

- 2 -

The family came to the attention of DHS on October 9, 2017, when DHS received a General Protective Services (GPS) report and three Child Protective Services (CPS) reports regarding R.E.L.-C. and Sibling. N.T. Term. Hr'g, 10/1/19, at 16; 9/17/21, at 166-68. The GPS report alleged that Sibling, while in an outpatient psychiatric program, had written a note accusing her stepfather of rape, and further accused her stepfather and mother of abuse.[3] N.T. Term. Hr'g, 10/1/19, at 117; **also** Goal Change Pet., 5/9/19, Ex. A. The report further alleged that Father had physically abused Sibling and had a history of sexual violence against another minor female child. N.T. Term. Hr'g, 9/17/21, at 166-68; **see also** Goal Change Pet., 5/9/19, Ex. A.

The CPS reports alleged that Father was registered as a Tier III sex offender under the Sex Offender Registration and Notification Act (SORNA)[4,5] and that despite being aware of his status, Mother left Sibling unsupervised in Father's care. N.T. Term. Hr'g, 9/17/21, at 166-68; **see also** Goal Change Pet., 5/9/19, Ex. A. Following a DHS investigation, both Mother and Father were indicated. **Id.**

---

[3] Mother later informed Dr. Erica Williams, a forensic evaluator, that "stepdad" referred to another former paramour of Mother's, not Father. N.T. Term. Hr'g, 10/1/19, at 116-18; 9/17/21, at 62-63.

[4] 42 Pa.C.S. §§ 9799.10-9799.42.

[5] The record reflects that Father was convicted of indecent assault, indecent assault – complainant less than thirteen years of age, unlawful contact with a minor, and sexual assault. **See** 18 Pa.C.S. §§ 3126(a)(1), 3126(a)(7), 6318, and 3124.1, respectively. As a result, he was subject to lifetime registration under SORNA.

The second CPS report alleged that Mother permitted a family friend to reside in the home and spend time alone with Sibling despite the fact that he was a convicted sex offender. *See* Goal Change Pet., 5/9/19, Ex. A. The third CPS report alleged that Mother left R.E.L.-C. unsupervised in the care of that family friend. *Id.* Mother admitted to the allegations in both the second and third CPS reports, and they were indicated as to Mother. *Id.*

During the course of their investigation, DHS interviewed both Mother and Father. Mother admitted that her former paramour molested her oldest adult child and that she left Sibling unsupervised at home with Father while she was at work. *See* Goal Change Pet., 5/9/19, Ex. A. Father admitted that he was a registered sex offender and agreed to stay at a separate location during the DHS investigation. *Id.*

DHS met with Sibling and both parents on October 11, 2017. *See* Goal Change Pet., 5/9/19, Ex. A. Mother admitted that she was aware of Father's prior convictions, but she denied the allegations of domestic violence. *Id.* Sibling stated that she and R.E.L.-C. were left alone with Father. *Id.* Father informed DHS that Mother permitted Sibling to go to the home of her former paramour who had molested Mother's eldest child. *Id.* Father admitted that he failed to inform the Pennsylvania State Police that Sibling lived in the home in which Father had registered his residency in accordance with SORNA. *See* Goal Change Pet., 5/9/19, Ex. A. However, Father claimed that he "did not know" the conditions of being a registered sex offender. *See* Goal Change Pet., 5/9/19, Ex. A.

That same day, DHS obtained orders of protective custody (OPC) for R.E.L.-C. and Sibling and placed them in the care of their maternal grandmother. *Id.* The trial court adjudicated R.E.L.-C. and Sibling dependent on October 20, 2017. *See* Order of Adjudication, 10/20/17, at 1-2; Goal Change Pet., 5/9/19, Ex. A. The trial court found aggravated circumstances as to Father and ordered that no reasonable efforts were to be made to reunify R.E.L.-C. and Father. *See* Aggravated Circumstances Order, 10/20/17, at 1-2. The trial court suspended Father's visitation with both R.E.L.-C. and Sibling and issued a stay-away order as to Sibling. *See* Order of Adjudication, 10/20/17, at 1-2. The court referred R.E.L.-C. for early intervention services and a psychological evaluation. *Id.* On October 27, 2017, R.E.L.-C. and Sibling were placed in kinship care with their maternal aunt, C.L. (Maternal Aunt). *See* Goal Change Pet., 5/9/19, Ex. A.

On November 8, 2017, DHS received a supplemental CPS report alleging that another note had been found in Sibling's diary stating that she had been sexually abused. *See* Goal Change Pet., 5/9/19, Ex. A. Sibling's family stated that they believed that Sibling had been sexually abused by Mother's former paramour, that Mother had a history of entering into cohabitating relationships with registered sex offenders and perpetrators of sexual abuse, that Mother's eldest child had also been sexually abused, and that Mother had exposed Sibling to three or four separate sex offenders. *Id.*

On November 9, 2017, the Community Umbrella Agency (CUA) held a single case plan meeting (SCP) to establish SCP objectives for Mother and

Father. *See* Goal Change Pet., 5/9/19, Ex. A. Mother was to comply with her Parenting Capacity Evaluation (PCE) referral, comply with parenting classes, attend a psychological evaluation, attend Achieving Reunification Center (ARC) for all services, and comply with her visitation schedule. *Id.*

On November 25, 2017, DHS received a written psychological evaluation of Mother that was conducted by Daniel J. Potoczniak, Ph.D., ABPP. *See* Goal Change Pet., 5/9/19, Ex. A. Dr. Potoczniak diagnosed Mother with adjustment disorder with anxiety and generalized anxiety disorder. *Id.* He recommended that Mother participate in weekly outpatient therapy and comply with DHS's recommendations. *Id.*

In January 2018, Mother gave birth to D.M.L.-C. *See* Goal Change Pet., 5/9/19, Ex. A. On January 12, 2018, the trial court held a permanency review hearing and ordered DHS to obtain an OPC and place D.M.L.-C. in care. *See* Perm. Rev. Order, 1/12/18, at 1. Mother's visits with the Children remained supervised at the Agency, and she was ordered to have no unsupervised contact with R.E.L.-C. *Id.* DHS obtained the OPC on January 15, 2018, and placed D.M.L.-C. with R.E.L.-C. and Sibling in the care of their Maternal Aunt. *See* Goal Change Pet., 5/9/19, Ex. A.

On January 24, 2018, the trial court adjudicated D.M.L.-C. dependent. *See* Adjudication of Dependency, 1/24/18, at 1-2. The trial court ordered a second SCP to address Father's visitation and to obtain further information regarding his sex offender registration. *See* Goal Change Pet., 5/9/19, Ex. A. Mother's visitation with both of the Children remained supervised at DHS. *Id.*

On April 6, 2018, the trial court held a permanency review hearing and found that Mother was substantially compliant with her permanency plan. *See* Perm. Rev. Order, 4/6/18, at 1-2. However, her visitation with both Children remained supervised line-of-sight. *Id.*

On May 16, 2018, CUA held the SCP meeting. *See* Goal Change Pet., 5/9/19, Ex. A. The Children's goals were identified as reunification with concurrent goals of placement with a relative. *Id.* Both parents' objectives remained the same. *Id.* On June 26, 2018, the trial court held a permanency review hearing and determined that Mother was substantially compliant with her permanency plan but ordered Mother's therapist to provide a treatment plan and referred Mother for a psychiatric evaluation. *See* Perm. Rev. Order, 6/26/18, at 1-2.

On October 25, 2018, CUA revised the SCP. *See* Goal Change Pet., 5/9/19, Ex. A. The Children's goals remained the same, and Mother's objectives were to comply with her PCE and all recommendations, her psychiatric evaluation and all recommendations, SAGE, parenting classes, and her court-ordered visitation. *Id.* The plan additionally recommended that Mother attend weekly therapy through People Acting to Help (PATH) and allow a home inspection. *Id.*

On November 8, 2018, the trial court held a permanency review hearing and found that Mother was substantially compliant with her permanency plan. *See* Perm. Rev. Order, 11/8/18, at 1-3. Specifically, the court noted that Mother had completed her PCE. *Id.* The court ordered CUA to obtain Mother's

psychiatric evaluation and implement recommendations from the PCE. *Id.* Mother graduated to supervised visits in the community and was ordered to provide CUA with verification of employment and housing. *Id.*

Erica Williams, Psy.D., and Samantha Peterson, MA, completed the PCE report in June of 2018. N.T. Term. Hr'g, 10/1/19, at 113-14. Although Dr. Williams deferred a diagnosis to a later date, she concluded that Mother did not have the capacity to provide safety and permanency to either the Children or to Sibling. *Id.* at 115. Dr. Williams recommended that Mother continue mental health therapy to help her deal with unresolved childhood issues, adult relationships, and the sexual abuse that she experienced as a child. *Id.* at 126-40. The report emphasized that Mother needed to understand the impact that her behavior and choices had on her children and the role she played in their placement. *Id.* Additionally, Mother was directed to complete a detailed psychiatric evaluation in order to obtain a differential diagnosis and determine whether medication management was appropriate. *Id.* Finally, Mother was directed to develop a safe, sustainable plan for childcare for time when she was at work or otherwise unavailable. *Id.*

On January 17, 2019, the trial court held a permanency review hearing and determined that Mother was fully compliant with her permanency plan. *See* Perm. Rev. Order, 1/17/19, at 1-2. Mother's visitation remained weekly and supervised. *Id.* The court ordered PATH to release all Mother's treatment plans and progress notes to CUA. *Id.*

On February 14, 2019, CUA revised the SCP.  *See* Goal Change Pet., 5/9/19, Ex. A.  At that time, the Children's primary goal was identified as adoption, with a concurrent goal of reunification.  *Id.*  Mother's objectives remained the same.  *Id.*

On May 8, 2019, DHS filed petitions to change Children's permanency goal to adoption and seeking involuntary termination of Mother's parental rights to the Children pursuant to Section 2511(a)(2), (a)(5), (a)(8), and (b).  *See* Pet. for Involuntary Term., 5/9/19, at 1-7; Pet. for Goal Change, 5/9/19, at 1-7, Ex. A.

The petitions detailed Father's criminal history, convictions, and sex offender status, as well as Mother's actions and inactions which had resulted in the Children being exposed to multiple sex offenders.  DHS also noted that at that time, R.E.L.-C. had been in care approximately nineteen months and D.M.L.-C. had been in care approximately sixteen months.

The trial court conducted evidentiary hearings on October 1, 2019, September 17, 2021, and November 17, 2021.[6,7]  DHS presented testimony from forensic evaluator Dr. Erica Williams, CUA permanency worker Allison Serge, CUA case supervisor Andrew Lemon, CUA case manager Tarnjif Kaur, and Mother.  Father presented testimony from his therapist, Dean Dickson.

At the conclusion of the hearings, the trial court terminated Mother's parental rights to the Children pursuant to Section 2511(a)(2), (a)(5), (a)(8), and (b), and changed the Children's permanency goals to adoption.

---

[6] Mother has been represented by three separate attorneys during the course of the instant proceedings.  Mother's first attorney appeared at the October 1, 2019 hearing and cross-examined two witnesses.  N.T. Term. Hr'g, 10/1/19, at 2-174.  At the subsequent hearing on November 6, 2019, Mother's first attorney asked the trial court to vacate his appointment due to a conflict with Mother.  N.T. Term. Hr'g, 11/6/19, at 3.  The trial court granted the request, appointed new counsel (Mother's second attorney) and continued the trial so that new counsel could familiarize himself with the case. *Id.* at 5*.*  Although the evidentiary hearings were postponed multiple times during the COVID-19 pandemic, the trial court held regular status review and permanency hearings.  Mother's second attorney represented her until December 20, 2021, when he requested that the trial court to vacate his appointment.  The trial court granted second counsel's request and appointed new counsel (Mother's current counsel).

[7] Meredith Marie Rogers, Esq. served as the Children's guardian *ad litem* throughout the proceedings.  Attorney Rogers argued that terminating Mother's parental rights was in the Children's best interests.  N.T. Term. Hr'g, 11/17/21, at 108-09.  Mario D'Adamo III, Esq., served as the Children's legal counsel during the termination proceedings, and appeared at the hearing on their behalf.  *Id.*; *see also In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020).  Attorney Adamo testified that he met with the Children on three separate occasions, and that at his latest visit, R.E.L.-C. and D.M.L.-C. appeared well-bonded with their caregiver (the Children's Maternal Aunt) and viewed her as a maternal figure.  N.T. Term. Hr'g, 11/17/21, at 96.

Mother timely appealed and simultaneously filed concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The trial court issued a responsive opinion addressing Mother's claims.

On appeal, Mother raises the following issues for our review:

1. Did the [trial court err] and/or abuse its discretion by denying Mother's motion that the trial court find that the petitions before the court were stale?

2. Did the [trial court err] and/or abuse its discretion by denying Mother's request for a new trial after new counsel had been appointed by the court midway through the trial?

3. Did the [trial court] rule in error that [DHS] met its burden of proof that Mother's parental rights should be terminated?

4. Did the [trial court err] and/or abuse its discretion in determining that there was not a sufficient [parent/child] bond and that [the Children] would suffer no irreparable harm upon termination of Mother's parental rights?

5. Did the [trial court err] under [the Juvenile Act, 42 Pa.C.S. § 6351, and 55 Pa.Code § 3130.74] in accordance with the provisions of the Federal Adoption and Safe Families Act, 42 U.S.C. § 671 *et seq.*, because the goal change to adoption was [not] the disposition best suited to the safety, protection, physical, mental, and moral welfare of the Child[ren]?

Mother's Brief at 7-8 (formatting altered).

**Staleness of Petitions**

In Mother's first issue, she claims that the trial court abused its discretion by denying her motion to dismiss the goal change and termination matters because the petitions were stale. Mother's Brief at 12. In support, she argues that because it took two years and six months since the filing of the petitions for the hearings to be completed, the facts and circumstances of

- 11 -

the case "could have changed." *Id.* at 12-13. Therefore, Mother argues that the trial court should have dismissed both matters and ordered DHS to file new petitions. However, Mother does not cite any legal authority to support her claim.

This Court has held that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (citations omitted); *see also* Pa.R.A.P. 2119(a) (providing that the argument section of appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities). Here, because Mother failed to cite any legal authority to support her staleness claim, this issue is waived. *See W.H.*, 25 A.3d at 339 n.3.

In any event, even if we declined to find waiver, we would agree with the trial court that Mother is not entitled to relief on this issue.

In its Rule 1925(a) opinion, the trial court explained:

The record reflects that when the TPR/goal change petitions were filed on or about May 8, 2019, [the Children] had been in continuous DHS care for approximately nineteen and sixteen months respectively. The trial court started the TPR/goal change trial on October 1, 2019, a reasonable period of time after petitions were filed. The record further established that the trial court diligently attempted and scheduled trial dates to continue the trial without prejudicing any of the parties or the permanency of [the] Children. However, due to Mother filing various motions and requesting continuances in the middle of the trial and the COVID-19 pandemic severely impacting court operations, the trial court was not able to resume an in-person trial until September 17, 2021. The trial court continued to do status and review hearings for the Children's safety via advanced technology

through the time court operations were curtailed by the COVID-19 pandemic. The trial court was very deferential to ensure that Mother and her attorneys had the needed time to present evidence and testimony since it recognized that sufficient time for the proceedings is of the utmost importance in TPR/goal change matters because issues in these proceedings are often complex and long-standing, and impact the constitutional rights of parents. Mother's former counsel, when making the oral motion, only argued that the trial court should find the petitions were stale and restart the TPR/goal change trial. Mother's former counsel presented no legislative or case law or reasoning for such a request. Furthermore, in a termination trial, the trial court must evaluate the testimony on the record given as it exists at the time of trial, regardless of when the petitions were filed . . . Taking all of the circumstances into consideration, the trial court saw no necessity to find the petitions stale and did not abuse its discretion denying Mother's oral motion.

Trial Ct. Op. at 14-15 (some formatting altered).

We agree with the trial court's reasoning. Therefore, even if properly preserved, Mother would not be entitled to relief on this claim.

**Motion for Mistrial**

In her second issue, Mother contends that the trial court erred and abused its discretion in denying her motion for a mistrial. By way of background to this claim, we reiterate that the trial court continued the proceedings on November 6, 2019, after Mother's first attorney moved to withdraw in the middle of the hearing. However, the second hearing did not occur until September 17, 2021, twenty-two months later. At that hearing, Mother's second attorney made an oral motion for a mistrial, arguing that the trial court's lengthy continuance prejudiced Mother, and suggesting that Mother's first attorney had been ineffective in questioning Dr. Williams. N.T.

Term. Hr'g, 9/17/21, at 11-12. Although the court denied Mother's motion, the court allowed Mother's second attorney to recall and cross-examine Dr. Williams regarding the basis for Mother's parental incapacity. *Id.* at 21-40.

On appeal, Mother contends that the trial court should have granted her request for a new trial because her second attorney could not provide effective representation after taking over a case in which previous counsel had participated. Mother's Brief at 17. Mother argues that, with regard to the testimony of Dr. Williams, "both attorneys could have taken different approaches into objections, questions, on cross-examination, [and] rebuttal testimony." *Id.* at 18. Mother concludes that no hardship would have occurred if a new trial had been granted. *Id.* at 18-19.

Our standard of review of a court's denial of a motion for mistrial is as follows:

> A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

*Commonwealth v. Bennett*, 225 A.3d 883, 890 (Pa. Super. 2019) (citations omitted).

Here, although Mother claims that her second attorney was ineffective, she has failed to identify in the record where counsel could have taken a different approach to objections, questions, cross-examination, or rebuttal

- 14 -

testimony. Similarly, Mother argues that her second attorney should have conducted his examination of Dr. Williams differently, but she does not explain how in her argument. Therefore, we conclude that Mother has waived this claim for purposes of appeal.[8] **See W.H.**, 25 A.3d at 339 n.3; Pa.R.A.P. 2119(a).

### Termination of Parental Rights

We now turn to Mother's arguments concerning termination decrees and goal change orders. We begin by stating our standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and

---

[8] In any event, the record reflects that, outside of COVID-19-related court closures, the vast majority of the continuances were caused by Mother and her attorneys. **See** Trial Ct. Op. at 13 (citations omitted). Mother's second attorney was afforded multiple continuances to prepare for trial, and was allowed to re-examine Dr. Williams. **Id.** Therefore, we find no abuse of discretion in the court's denial of Mother's mistrial motion and conclude that, even if she had properly preserved this issue, Mother would not be entitled to relief. **See Bennett**, 225 A.3d at 890.

resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

## Section 2511(a)(2)

Mother argues that the trial court erred in terminating her parental rights under Section 2511(a)(2). Mother's Brief at 19. In support, she asserts that she was attempting to remedy the situation that had resulted in the Children's placement. *Id.* Specifically, Mother notes that she ended her relationship with Father, was compliant with her SCP objectives, completed parenting programs, and was attending weekly therapy. *Id.* at 19-23. Mother also states that she was no longer living with any registered sex offenders. *Id.* at 25. Therefore, Mother concludes that she was able and willing to rectify her parental incapacity. *Id.*

Section 2511(a)(2) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of [Section] 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The

- 17 -

grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied.

*In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019) (citations and quotation marks omitted).

Further, this Court has explained:

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct.

Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

Thus, while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.

*In re Z.P.*, 994 A.2d 1108, 1117-18 (Pa. Super. 2010) (citations omitted and formatting altered).

Additionally, this Court has stressed that "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities." *Interest of D.R.-W.*, 227 A.3d 905, 914 (Pa. Super. 2020) (citation omitted and formatting altered).

- 18 -

Here, the trial court provided a thorough discussion of the evidence presented at the termination hearings. *See* Trial Ct. Op. at 15-29. Briefly, the trial court explained that although Mother had completed some parenting classes, she needed to complete additional parenting classes before she would be able to care for the Children. *Id.* at 16-18. The court also noted that although Mother testified that she attended therapy, she did not sign the necessary consents and releases, or provide proof of her attendance. *Id.* at 25-27. Further, while Mother did provide evidence of her employment and current lifestyle, the trial court remained concerned that she worked and lived near Father and still intended to co-parent with him. *Id.* at 17-18. Additionally, there were concerns that Mother was coaching the Children to be hostile to caseworkers, and that she had not complied with the trial court's orders to keep Father from contacting Sibling. *Id.* at 18-20. Although Mother had undergone a PCE, she was not compliant with the report's recommendations. *Id.* at 23-25. Mother still did not seem to recognize the safety concerns inherent in exposing the Children to sex offenders. *Id.*

The trial court then explained:

> The CUA case manager testified that safety threats with respect to Mother "continue to exist today." Dr. Williams also stated that her concerns regarding Mother's ability to provide safety and permanency to [the] Children continued to exist. Dr. Williams testified that without specific intervention and change, Mother's incapacity to provide safety and permanency would be ongoing and enduring. While Mother has been found substantially compliant at various hearings throughout the life of this case, by the time the termination trial finished, there were still significant concerns about Mother's ability to safely parent [the] Children.

- 19 -

Mother completed some of her SCP objectives, but she did not complete the critical recommendations of her PCE. Mother refused or declined to comply with signing releases for CUA to verify whether Mother was attending trauma therapy consistently weekly and if it was appropriate. The trial court found the testimony of DHS's witnesses forthcoming and credible. Given the testimony and exhibits entered into evidence, the trial court found clear and convincing evidence to terminate Mother's rights to [the] Children under [Section] 2511(a)(2). Mother had ample opportunity to put herself in a position to adequately parent and care for [the] Children, but her repeated and continued incapacity has not been mitigated. Mother is unable to meet [the] Children's basic needs. Mother has demonstrated an unwillingness to remedy the causes of her incapacity to parent in order to provide [the] Children with the essential parental care, control, or subsistence necessary for their physical and mental well-being.

Trial Ct. Op. at 28 (citations omitted).

Following our review, we conclude that the trial court's findings are supported by competent, clear, and convincing evidence in the record, and we find no error in the court's legal conclusions. *See T.S.M.*, 71 A.3d at 267. Therefore, the trial court did not abuse its discretion by terminating Mother's parental rights to Children pursuant to Section 2511(a)(2). *See C.M.K.*, 203 A.3d at 262. Accordingly, Mother is not entitled to relief.

### Section 2511(b)

Mother also challenges the trial court's conclusion that termination was appropriate under Section 2511(b). Mother's Brief at 33-48. Specifically, Mother argues that the court did not properly address the parent-child bond or give enough weight to the evidence regarding Mother's visitation with the Children. *Id.* at 33, 41-42. Mother additionally contends that there was no evidence that R.E.L.-C. wanted to be adopted. *Id.*

- 20 -

Section 2511(b) states in relevant part:

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (citation omitted). This Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted and formatting altered). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). The question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id.* at 764. "Section 2511(b) does not require a formal bonding evaluation" and caseworkers may offer their opinions and evaluations of the bond. *Z.P.*, 994 A.2d at 1121 (citation omitted).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children." *T.S.M.*, 71 A.3d at 269. Finally, we reiterate that the court may emphasize the safety needs of the child. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Here, the trial court explained:

Mother's testimony suggests a bond between her and at least [R.E.L.-C.,] but it is not a healthy bond. Mother has been compliant with visitation with [the] Children, but she has not been attentive to their behavioral needs, nor do [the] Children present with a healthy parental bond with Mother. [D.M.L.-C.] has been in his placement since he was a newborn and has known no other home. It would be detrimental to remove either [one of the] Children from their placement with Maternal Aunt. The CUA case manager testified that visitation should remain supervised, as it has throughout the life of this case. The Children attend visits

with Mother, and recognize her. However, Mother has not assumed her responsibility to develop a real bond and not just a casual relationship. The record has established that Mother's unwillingness to complete all her SCP objectives, particularly her mental health objectives, comprehend her role in the Children coming into care, the safety risk that Father poses, her lack of protective capacity, and her lack of cooperation with CUA's assistance has compromised her ability to bring safety and stability to the Children. Mother has an affirmative duty to put herself in a position to develop a real bond. Mother does not have an existing, necessary, and beneficial relationship with either Child to be preserved. Because there is not a beneficial bond to preserve, it is in [the] Children's best interest to terminate Mother's parental rights and be freed for adoption. There will be no irreparable harm to either Child if Mother's parental rights are terminated. DHS's witnesses were credible. The record establishes by clear and convincing evidence that termination would not sever an existing and beneficial relationship between Mother and Children. The trial court also appointed TPR legal counsel for [the] Children for termination purposes. Children's TPR counsel met with [the] Children on three occasions. TPR counsel reported to the court that both Children appear "very well bonded with their caregiver" and both "see[] her as a mother figure."

Trial Ct. Op. at 43-44 (citations omitted).

Following our review of the record, we discern no abuse of discretion by the trial court. *See T.S.M.*, 71 A.3d at 267. The record supports the trial court's conclusion that there was no beneficial bond between the Children and Mother, that Maternal Aunt fulfills a parental role for the Children, and that there would be no irreparable harm to either Child if Mother's parental rights were terminated. *See K.Z.S.*, 946 A.2d at 764. Accordingly, the trial court did not abuse its discretion in concluding that the termination of Mother's parental rights would best serve the Children's developmental, physical, and

emotional needs and welfare. **See C.L.G.**, 956 A.2d at 1009-10. Therefore, Mother is not entitled to relief on this issue.

## Permanency Goal Change

In her final issue, Mother purports to challenge the trial court's orders changing the Children's permanency goal to adoption. Mother's Brief at 8. In support, Mother reiterates the same arguments that she raised concerning the termination of her parental rights and the effect of severing her bond with the Children. **Id.** at 46. However, Mother does not cite any legal authority supporting her challenge to the permanency goal changes nor has she developed her argument to address the goal change other than to state her opposition to it in a boilerplate manner. Accordingly, we conclude that Mother has waived this claim. **See W.H.**, 25 A.3d at 339 n.3 (stating that a party's failure to develop a claim may result in waiver); Pa.R.A.P. 2119(a). Therefore, Mother is not entitled to relief on this issue. Further, even if Mother's claim was not waived, we agree with the trial court's reasoning concerning the permanency goal changes and conclude that no relief is due.

For these reasons, we conclude that the trial court did not abuse its discretion in terminating Mother's parental rights to the Children. **See T.S.M.**, 71 A.3d at 267. Further, Mother failed to preserve her challenges to the permanency goal change orders. **See W.H.**, 25 A.3d at 339 n.3. Accordingly, we affirm.

Orders and decrees affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/19/2022