2019 PA Super 363

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAKREE S. BENNETT | : | |
| | : | |
| Appellant | : | No. 2310 EDA 2018 |

Appeal from the Judgment of Sentence Entered February 9, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003953-2016

BEFORE:   BENDER, P.J.E., STABILE, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED DECEMBER 23, 2019**

Appellant, Shakree S. Bennett, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia after a jury found him guilty on charges of involuntary deviate sexual intercourse ("IDSI"), robbery, and possessing instruments of crime ("PIC").   Sentenced to an aggregate sentence of 22 ½ to 45 years' incarceration, Appellant contends the trial court violated his right to confront the witnesses against him and erroneously denied his motion for mistrial.   We affirm.

The trial court opinion sets forth the pertinent facts, as follows:

On September 28, 2015, at about 11:30 p.m., Philadelphia Police Officer Gerard Brennan was on patrol training another officer in the area of Temple University, when he received a radio call directing him to go to the 1400 block of Carlisle Street to investigate reports of a woman screaming and a rape.  The officer immediately proceeded to that location and encountered S.D., the

_____

[*] Former Justice specially assigned to the Superior Court.

complainant herein, who was in an ambulance being treated by emergency medical personnel.

Officer Brennan received information from the complainant concerning what the alleged assailant was wearing and that he was armed with a silver gun, which the officer put out over police radio. The complainant described the assailant as being a black male, in his twenties, about six feet tall and wearing a green jacket or vest, blue jeans, and a long black t-shirt. She further related that the assault occurred about thirty yards from where the officer encountered her. The officer then had the complainant exit the ambulance and took her to the headquarters of the Police Department's Special Victim's Unit (hereinafter SVU). Officer Brennan left the Unit after the complainant's parent arrived.

S.D., a student at Temple University, had spent the night of the incident studying at the library, which she left at about 11:00 p.m., with members of her study group. After stopping to buy a cookie, she left her friends at Broad and Cecil B. Avenue and then walked alone a half block north to Carlisle Street where her apartment was located.

When S.D. reached Jefferson Street and was crossing it, she heard the sound of footsteps on Jefferson Street going west from Broad Street. She turned around at which time a black male grabbed her and hit her on the arm with a small silver hand gun. The male then [directed] her to a desolate area. She screamed, but the male, who still was brandishing the gun told her to be quiet.

The male then rifled through her backpack and wallet, and after taking some items from it including her cell phone, he told S.D. to take off her clothes. She did as ordered and the male put on a condom and anally raped her.[fn]

---

Fn. Video surveillance cameras at various locations recorded S.D. as she proceeded toward her apartment.

---

S.D. cried while this was occurring and the male ordered [her] to stop and moan. After about seven or eight minutes, the assailant stopped anally raping S.D. and pulled up his pants. After S.D. put

- 2 -

her clothes back on, the assailant ordered her to go in a direction toward her apartment and he went down Jefferson Street. S.D. indicated that the male was wearing jeans, a hat and a "greyish-green jacket-vest thing." S.D. entered her apartment and directed one of her roommates to call the police. Officer Brennan arrived shortly thereafter and took her to the S.V.U.

Once at the S.V.U., S.D. was examined by a nurse and a Rape Kit was prepared after which she gave Detective Kimberly Organ a statement. Detective Organ then drove S.D. back to Temple University and had her repeat the route she walked home from the library and the location where the rape occurred. Two days thereafter, detectives came to her apartment and showed her still photographs produced from video recordings taken the night of the incident for the purpose of ascertaining whether she could identify [her assailant from the video and photographs]. Upon viewing the videos, S.D. positively identified a male depicted in them as the person who sexually assaulted her. S.D. identified him by his physical features and the clothing he was wearing.[fn]

---

Fn. After identifying Appellant in the photograph, S.D. told her mother that she was positive that Appellant was the person who assaulted her.

---

On October 9, 2015, S.D. took part in a photographic identification session. Upon reviewing the photographs, she selected a photograph of Appellant because the photograph of him that she saw most resembled her assailant because the facial hair and complexion was right. When she selected the photograph she said that she was not one hundred percent sure and wanted to look at additional photographs. She did not change her mind or select another photograph upon reviewing additional photos, and thereafter positively and with certainty identified Appellant at his preliminary hearing and during trial before [the trial] court as the person who raped her.

Dr. Ralph Riviello, a professor of emergency medicine at Drexel University, and an affiliate of Philadelphia Sexual Assault Response Center, reviewed medical records pertaining to the examination of S.D. the night of the incident that was performed by Nurse Jenika Miles. The examination of S.D. consisted of an

interview concerning the incident, a physical examination, and the collection of biological materials from her body, which are then turned over to the police for further examination and testing. The physical examination of S.D. revealed that she suffered redness on her right buttock, a bruise to her left upper arm, and tenderness to the touch in the area of her anus.

Mr. John Haggerty, a Temple student at the time of the incident herein, was walking down Carlisle Street at about the time of the incident when he saw a man and a woman next to a dumpster against the wall. Both persons were facing the wall. At the time, he thought that the persons were engaged in a consensual act.

The next day, upon learning of the incident herein, Mr. Haggerty spoke to the police and said he got a side view of the male. He described the male he had seen the previous evening by the dumpster as African American, with a goatee who was wearing a hat or had close cropped hair, and a big jacket. A couple days later Mr. Haggerty also looked at photographs developed from a video recording and identified a person depicted therein, who was Appellant, as the male he saw by the dumpster based on the jacket that the person was wearing and the person's face.

Mr. Benjamin Mallow, a parole officer with the Commonwealth of Pennsylvania who, as a parole officer, supervised Appellant, saw one of the video[] recordings taken by security cameras in the area where the incident herein occurred. Upon watching the video, which was broadcast on local television stations following the rape of S.D., Mr. Mallow identified Appellant, who he saw once a month over an eight month period when he was supervising him. Mr. Mallow contacted the police and gave them a statement. The police also had him review photographs depicting Appellant developed from one of the video recordings recovered by police taken on the night of the incident and told the police that they depicted Appellant.

United States Marshall Pedro Alvarez, who supervised and oversaw fugitive and criminal investigations in New Jersey, commenced an investigation involving Appellant after being requested to do so by the Philadelphia S.V.U. and because of a parole violation. On October 7, 2015, Marshall Alvarez and members of his team went to a residence in Newark, New Jersey, where they encountered Shaheed Bennett, Appellant's brother, who appear[ed] to hesitate when asked if he knew where

- 4 -

Appellant might be located. While knocking on the front door the authorities heard someone stumbling and the sound of footsteps inside the residence. As a result thereof, they asked Mr. Bennett if they could search the residence for Appellant and he consented. On the third floor of the residence police found Appellant hiding under a bed. He refused to come out from under the bed and although he began kicking and punching, he was eventually apprehended. Incident to his apprehension, police seized a cell phone, a puffy purple jacket, a blue hooded sweatshirt, and a black hat. These items were turned over to the Philadelphia Police Department.

Philadelphia Police Detective Edward Enriquez of the SVU was assigned to investigate the rape of S.D. Upon being assigned, he collected video recordings made by various surveillance cameras situated on Temple University's campus and the route S.D. took to her residence. One of the recordings depicted S.D. running into her apartment at about 11:43 p.m., and a male fitting the flash information broadcast by Officer Brennan on other videos recorded at various locations on the campus and near the scene of the rape. The last time that individual is depicted on a video is 11:43, at 15th and Jefferson Streets, a location a half block from Carlisle Street.

These videos showed S.D. on the campus proceeding down Carlisle Street from Cecil B. Moore Avenue. He then walked South on Broad Street to Jefferson Street where he went westbound. He is next seen on a video at 11:43 p.m., at 15th and Jefferson Streets. Police developed still photographs depicting Appellant from these videos, which Detective Enriquez released for public broadcast. [As noted, *supra*, Parole Officer Mallow] thereafter informed police that he could identify the person in the photographs after which S.D. was asked to participate in a photo identification session. In another video taken on September 21, 2015, Appellant was observed purchasing the jacket he was wearing in the other videos recorded the night of the incident.

Detective Enriquez received the items recovered by Marshall Alvarez and placed them on a property receipt. He also obtained a search warrant for Appellant's cell phone but it could not be accessed because police did not have its password.[]

Natisha Bush, a witness for the defense, testified that she resided in the 1400 block of North 15th Street and that Appellant was her

- 5 -

fiance'. She stated she gave Appellant money from the jacket he was observed purchasing in the [above-referenced] video. She added that the jacket was missing its lining and that Appellant left the residence they shared in the morning wearing the clothes he had on in the videos. Further, she remarked that he did not take a change of clothing with him when he left in the morning of the day the incident occurred. Finally, she indicated that he usually returned home from work between 9:00 p.m. and 12:00 a.m.

Trial Court Opinion, 10/29/18, at 1-7.

Appellant presents the following questions for our consideration:

1. Did the lower court violate Appellant's rights to confront the witnesses against him when it allowed the Commonwealth to substitute Dr. Riviello for Jenika Miles at the last minute and allowed Dr. Riviello to introduce testimonial evidence against Appellant of which the doctor had no personal knowledge?

2. Did the lower court err in denying Appellant's request for a mistrial when the jury indicated that it had reached a verdict on one charge, but the lower court did not take the verdict or in any way preserve it?

Appellant's brief, at 4.

In Appellant's first issue, he claims that the trial court violated his constitutional right to confront the witnesses against him when it allowed a doctor to relate to the jury a written report prepared by a nurse who, alone, conducted a post-assault interview and examination of S.D. and recorded S.D.'s description of her rapist. We disagree.

Initially, we set forth our standard of review:

An appellate court's standard of review of a trial court's evidentiary rulings which include rulings on the admission of hearsay is abuse of discretion. [ ] **Walter**, ...93 A.3d [at] 449 ... citing **Commonwealth v. Delbridge**, 578 Pa. 641, 653 n.8, 855 A.2d 27, 34 n.8 (2003). However, whether a defendant has been denied his right to confront a witness under the Confrontation Clause of the Sixth Amendment to the United States Constitution,

made applicable to the States via the Fourteenth Amendment, ***Pointer v. Texas***, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965), is a question of law, for which our standard of review is *de novo* and our scope of review is plenary. ***Commonwealth v. Yohe***, 621 Pa. 527, 542–45, 79 A.3d 520, 530–531 (2013) *citing* ***Commonwealth v. Cannon***, 610 Pa. 494, 22 A.3d 210 (2011).

***In re N.C.***, 105 A.3d 1199, 1210 (Pa. 2014).

In a trial that hinged solely upon identification, Appellant maintains, it was reversible error to allow the doctor to read into the record S.D.'s description of her assailant because it deprived Appellant the opportunity to ask the nurse whether S.D. displayed any equivocation or uncertainty when offering her description. The Commonwealth counters that it was S.D., and not the nurse, who made the statements at issue, and S.D. testified under both direct examination and cross-examination at trial. Therefore, Appellant had the opportunity to confront his accuser about not only her certitude in the description she gave to the nurse but also moments of indecision she experienced while identifying Appellant from the photo array.

Notably, Appellant relies on decisional law pertaining to a defendant's Confrontation Clause rights against testimonial hearsay arising from the reading of an expert forensic report prepared by an out-of-court declarant. ***See*** Appellant's brief, at 12-14 (discussing, *e.g.*, ***Williams v. Illinois***, 567 U.S. ----, 132 S.Ct. 2221 (2012), ***Bullcoming v. New Mexico***, 564 U.S. 647 (2011), ***Melendez-Diaz v. Massachusetts***, 557 US 305 (2009)). We find such jurisprudence, however, inapposite to the specific argument he has developed, which focuses not on the physical examination or any medical

opinion deriving therefrom, but on only the description S.D. gave of her assailant during the interview. [1]

Indeed, Appellant points to no aspect of the doctor's testimony where he attempted to stand in the nurse's stead and frame, or provide a broader medical context to, S.D.'s description of her assailant. Nor does Appellant maintain that the doctor read the nurse's impressions or professional assessment of S.D.'s statement. Appellant's argument posits only that the court should not have permitted the doctor to read to the jury the report's recordation of S.D.'s description of her assailant.

Therefore, we find Appellant's Confrontation Clause concerns to be without merit, as it is axiomatic that the Confrontation Clause does not apply

_____

[1] Indeed, following Appellant's review of cases concerning the application of Confrontation Clause rights to testimony regarding forensic examinations, he admits the defense theory turned not on the forensic examination but, instead, on identification evidence offered at trial:

> The trial was over identification, not the crime itself; no one attempted to cast doubt on S.D.'s claim that she was sexually assaulted. The defense was simply that Appellant was not the culprit. . . . Just as the Commonwealth had to call as a witness Detective Kimberly Boston to testify regarding the identification procedure she did with S.D. . . . likewise the Commonwealth needed to call Ms. Miles to give Appellant the opportunity to cross-examine regarding S.D.'s description.

Appellant's brief, at 16-17. Nowhere in Appellant's argument does he maintain that the nurse's expert or forensic assessment of S.D.'s statement was read into the record in contravention of his right to cross-examine the nurse on such impressions and conclusions.

where the out-of-court declarant is available for cross-examination in court. *Commonwealth v. Barnett*, 50 A.3d 176, 189 n.6 (Pa.Super. 2012). S.D. was the declarant in question, and she was available for cross-examination at trial.

In Appellant's remaining issue, he argues that the trial court erred when it denied his request for a mistrial after a juror, whom the court excused during deliberations, and the court crier noted that the jury had reached a verdict on one charge but not on the others. By neither recording the partial verdict nor making any inquiry into it prior to empaneling an alternate juror and starting deliberations anew, Appellant submits, the court subjected him to double jeopardy and denied him his right to a trial by jury.

The record shows, however, that prior to the dismissal of the original juror and the seating of the alternate juror, the remaining members of the jury had notified the court, through the court crier, that they no longer agreed on a verdict to any charge. N.T. at 11/17/17, at 30. As such, the court excused the original juror, assigned the alternate juror, and instructed the jury to recommence its deliberations. N.T. at 33-35.

The trial court summarizes the relevant events, as follows:

This claim stems from events after the jury commenced deliberations. One of the jurors had been advised when she was first selected as a juror that the trial would end and her jury service would be finished in time for her to take her vacation. However, because of delays beyond the control of the court, the trial went longer than anticipated, thereby jeopardizing the juror's vacation and, therefore, the juror had to be released and an alternate seated in her place. N.T. at 15-16.

To compound matters, before the juror could be relieved and replaced, the court crier advised that the jury, as originally constituted, had reached a verdict on one of the charges. N.T. at 18. A discussion then ensued involving the court and the attorneys concerning a possible solution to the problem including, taking the partial verdict from the original jury and then direct the reconstituted jury deliberate on the remaining charges, seal the partial verdict and announce it after the reconstituted jury reached a verdict on the remaining two charges, or have the reconstituted jury start deliberations anew on all three charges. N.T. at 18-29.

Before adopting one of these options, the court crier indicated that the original jury had not, in fact, reached a verdict on one of the charges and that the original jury was again deliberating. N.T. at 30. Upon being so informed, this court excused the original juror, replaced her with the alternate, and directed the reconstituted jury to continue deliberations after giving it instructions. N.T. at 30-35. After all of this occurred, defense counsel lodged a general objection, which this court denied altogether with an earlier motion for a mistrial. N.T. at 32-33.

Trial Court Opinion, at 14-15.

Our standard of review of a court's denial of a motion for mistrial is as follows:

A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

***Commonwealth v. Caldwell***, 117 A.3d 763, 774 (Pa.Super. 2015)(quoting

***Commonwealth v. Akbar***, 91 A.3d 227, 236 (Pa.Super. 2014)).

Appellant fails to make the requisite demonstration of prejudice from the record, as it is clear that the jury informed the court that it had not reached

- 10 -

a verdict as to any charge prior to the release of the original juror and seating of the alternate juror. With its factual predicate thus belied, we deem Appellant's claim meritless.

Judgment of sentence affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/19