J-S11009-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| RASHAWN COMBS | : | |
| | : | |
| Appellant | : | No. 3161 EDA 2022 |

Appeal from the Judgment of Sentence Entered September 22, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006314-2018

BEFORE: BOWES, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.: **FILED JULY 18, 2024**

Rashawn Combs appeals from the aggregate judgment of sentence of thirty to eighty years of imprisonment imposed upon his convictions of murder of the third degree and conspiracy to commit murder of the third degree. We affirm.

In affirming a jointly-tried co-defendant's judgment of sentence, this Court previously recited the factual and procedural background relevant to this matter as follows:

> In March 2022, a jury convicted Appellant, Michael Blackston, Chad Rannels, and [Semaj Armstead] of charges related to the December 2011 murder of Kevin Drinks ("Decedent"), whom they mistakenly believed was a witness to a prior murder for which Rannels was awaiting trial. . . .
>
> In 2011, Philadelphia police arrested Rannels for the July 30, 2011 murder of Kristin Freeman. While in prison awaiting his

_____

[*] Retired Senior Judge assigned to the Superior Court.

preliminary hearing, Rannels made fourteen recorded phone calls between September 27, 2011, and December 9, 2011, including several to Blackston and [Armstead]. Relevantly, during the calls Rannels provided an address and description of a person he believed was an eyewitness to the murder named John Fisher. The calls also included [references to Appellant's telephone number]. Rannels repeatedly instructed the co-defendants to be on their "A-Game."

On December 10, 2011, four days prior to Rannels's scheduled preliminary hearing, Blackston, while standing on a corner with Appellant, [Armstead], and Eugene Floyd, saw Decedent drive by them in a white [box] truck. Blackston said, "That is the guy right there." Floyd, to whom the Commonwealth granted immunity, testified at trial that he understood [Blackston]'s statement to mean that the driver of the truck was the eyewitness to Mr. Freeman's murder. It is undisputed that Decedent had an "uncanny" resemblance to the eyewitness, Mr. Fisher, and that Mr. Fisher and Decedent both drove white trucks.

[At the encouragement of both Appellant and Armstead, the] four men immediately entered vehicles and followed Decedent in his white truck. Floyd drove Blackston in a Chevrolet minivan while [Appellant] drove [Armstead in] a white PT Cruiser. The police eventually discovered that [Armstead]'s sister owned the minivan and Blackston's girlfriend owned the PT Cruiser.

The co-conspirators followed Decedent for approximately six hours while Decedent made deliveries and while the co-conspirators maintained constant communication with each other. At 6:17 p[.]m., after receiving confirmation of the truck's location from [Appellant] in the PT Cruiser, Floyd parked the minivan close to where Decedent had parked the white truck. Blackston then exited the minivan, ran to the white truck, and fatally shot Decedent. The co-conspirators then left the area and reconvened at the house of [Armstead]'s sister[, where they agreed never to discuss the incident]. Police arrived at the murder scene minutes later and transported Decedent to the hospital where he was pronounced dead.

During the initial investigation, police recovered the surveillance videos from several cameras in the area around the murder, from which they identified the PT Cruiser as a vehicle of interest. Detectives, however, did not connect the co-conspirators

to the crime until 2018. Ultimately, the Commonwealth charged Appellant and his three co-defendants with murder and related crimes.

In March 2022, the trial court presided over a joint jury trial of Appellant and his co-defendants. Floyd testified to the narrative set forth above. The jury also viewed a compilation video of the surveillance camera videos. As described by the trial court, the video depicted the PT Cruiser following a white box truck and then passing the truck as it parked at 5:48 p.m. The video also showed the PT Cruiser and the minivan circling the murder scene between 5:48 p.m. and 6:16 p.m., immediately before the 6:17 p.m. murder.

Detectives also testified regarding the cell phone records and historical cell site data for the co-conspirators' phones on the day of the murder. The records documented nearly [forty] connections between [Armstead] and Floyd's phones between 3:37 p.m. and 6:19 p.m. on the day of the murder and revealed that Blackston's phone "went off the network" sometime after a nearly eight-minute phone call from [Armstead]'s phone beginning at 3:03 p.m. Historical cell site analysis tracked [Appellant's] and [Armstead]'s phones traveling together along the path that Decedent took prior to the murder, in the area of the murder at the time of the murder, and driving to the Glenwood section of Philadelphia immediately after the murder. Finally, the jury heard the recordings of Rannels'[s] prison phone calls, including those on which [Armstead] participated [and Appellant's phone number was mentioned].

***Commonwealth v. Armstead***, 1269 EDA 2022, 2024 WL 1478838, at *1-2

(Pa.Super. 2024) (non-precedential decision) (cleaned up).

Additionally, the Commonwealth introduced testimony from Detective John Verrecchio relating to a prison call made by Appellant while incarcerated for unrelated charges. Appellant did not lodge a contemporaneous objection. However, when the detective finished testifying moments later, Appellant's counsel moved for a mistrial outside the presence of the jury, arguing that the witness should not have made a reference to Appellant being in jail. The court

- 3 -

denied the motion and provided the following instruction to the jury: "Ladies and gentlemen, before we resume the testimony or presentation of evidence, I just want to tell you this instruction: The jury is not to consider or make any adverse or negative inference to any defendant being in custody." N.T. Trial, 3/25/22, at 138.

At the conclusion of trial, the jury acquitted Appellant of first-degree murder, but convicted him of third-degree murder and conspiracy to commit third-degree murder. Notably, the co-defendants were convicted of first-degree murder and a corresponding conspiracy to commit the same. Appellant was sentenced as indicated hereinabove,[1] and he timely filed a post-sentence motion and supplemental post-sentence motion, contending that his consecutive sentences constituted a *de facto* life sentence and that the verdicts were against the weight of the evidence. The trial court denied the motion without a hearing.

This timely appeal followed. The court ordered Appellant to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and he complied. The trial court then issued a Rule 1925(a) opinion.

Appellant presents the following issues for our review, which we have reordered for ease of disposition:

    I.     Was the evidence insufficient to sustain the guilty verdict for conspiracy to commit murder[ of the third degree] as there was

---

[1] Specifically, the trial court imposed a consecutive term of fifteen to forty years of imprisonment on each conviction of murder of the third degree and conspiracy to commit murder of the third degree.

no direct evidence that Appellant agreed with the other co-defendants to commit any murder, and furthermore the circumstantial evidence was insufficient to prove the existence of an agreement as, in part, there was no evidence Appellant was aware that anyone possessed a firearm or intended to shoot the murder victim?

II. Was the evidence insufficient to sustain the guilty verdict for murder[ of the third degree] as there was no evidence that Appellant possessed any firearm, was aware of the existence of any firearm, fired a firearm[,] or otherwise caused the victim's death?

III. Were the verdicts against the weight of the evidence for murder[ of the third degree] and conspiracy to commit murder[ of the third degree] as the only evidence tying Appellant to the murder came from a self-interested, unreliable and un-indicted co-conspirator[?]

IV. Appellant was convicted of murder[ of the third degree] and conspiracy to commit murder[ of the third degree], while the co-defendants were convicted of murder[ of the first degree] and conspiracy to commit murder[of the first degree], therefore, were the inconsistent verdicts against the weight of the evidence as Appellant was convicted of conspiring to commit a different crime than that committed by the co-defendants[?]

V. Did the trial court err in denying Appellant's motion for a mistrial, as the prosecutor committed prosecutorial misconduct when [she] elicited through Detective Verecchio that Appellant had been incarcerated in an unrelated matter[?]

VI. Did the trial court abuse its discretionary aspects of sentencing by entering an excessive consecutive-in-nature sentence that was more than necessary to protect the public, vindicate the complainant's family, overly harsh in light of the numerous mitigating factors and Appellant's need for rehabilitation[?]

Appellant's brief at 6-7 (cleaned up, argument omitted).

In his first two issues, Appellant challenges the evidentiary sufficiency of both of his convictions. We consider Appellant's position mindful of the following well-settled standard of review:

> When reviewing a [sufficiency] claim, we face a question of law. Accordingly, our standard of review is *de novo*. We view the evidence in the light most favorable to the Commonwealth, as the verdict winner, and we draw all reasonable inferences therefrom in the Commonwealth's favor. Through this lens, we must ascertain whether the Commonwealth proved all of the elements of the crime at issue beyond a reasonable doubt.
>
> The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, we may not weigh the evidence and substitute our judgment for the factfinder. Any doubts regarding a defendant's guilt may be resolved by the factfinder, unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances.

*Commonwealth v. Roberts*, 293 A.3d 1221, 1223 (Pa.Super. 2023) (cleaned up).

As noted, Appellant was found guilty of conspiracy to commit third-degree murder and third-degree murder. "[T]o sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Fisher*, 80 A.3d 1186, 1190 (Pa. 2013) (citation omitted). With respect to murder of the third degree, our High Court has summarized thusly:

To convict a defendant of the offense of third[-]degree murder, the Commonwealth need only prove that the defendant killed another person with malice aforethought. This Court has long held that malice comprehends not only a particular ill-will, but also a wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Commonwealth v. Fisher*, 80 A.3d 1186, 1191 (Pa. 2013) (citation omitted).

Further, our law directs that under certain circumstances, an actor may be held liable for the actions of others pursuant to the doctrine of conspiratorial liability:

Where the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if such acts are done in pursuance of the common design or purpose of the conspiracy. Such responsibility attaches even though such conspirator was not physically present when the acts were committed by his fellow conspirator or conspirators and extends even to a homicide which is a contingency of the natural and probable execution of the conspiracy, even though such homicide is not specifically contemplated by the parties.

*Commonwealth v. Geiger*, 944 A.2d 85, 91 (Pa.Super. 2008) (citation omitted).

On appeal, Appellant argues that his conspiracy conviction cannot stand because "the only evidence tying [A]ppellant to the murder was . . . un-indicted co-conspirator Floyd's testimony and unimpressive historical cell site analysis, which arguably narrowed down position location to one mile, which encompasses a wide swath of North Philadelphia." Appellant's brief at 39. He

highlights that no fingerprints taken from the PT Cruiser matched his own. *Id*. at 40. Appellant also contends that he was "in a separate car, had no knowledge of any firearm, and therefore had no knowledge of an impending murder." *Id*. At most, he believes that the evidence merely showed his presence near the crime scene, which is insufficient. *Id*.

Similarly, Appellant maintains that the conviction for third-degree murder must be vacated because the Commonwealth's only eyewitness to the crime, Floyd, testified that "[A]ppellant did not possess any firearm, had no knowledge of any firearm, and did not shoot any firearm." *Id*. at 41. He argues that there was no proof that he thus "committed any murder with malice." *Id*. Appellant suggests that the Commonwealth proved neither the criminal act nor the intent required for murder. *Id*. at 41-42.

The trial court thoroughly addressed both claims in its Rule 1925(a) opinion. *See* Trial Court Opinion, 8/15/23, at 45-51. With respect to the conspiracy, it noted that the co-defendants used coded language when discussing the plan to eliminate Decedent. *Id*. at 48. While Appellant did not directly participate on the initial jail calls with Rannels, his phone number was nonetheless discussed by the co-defendants. *Id*. The court recounted that Appellant was the driver of the PT Cruiser and that he followed Decedent throughout Philadelphia for hours while, along with Armstead, providing locations to Floyd by cell phone. *Id*. Additionally, Appellant continued to

circle the block as Blackston approached and shot Decedent. *Id*. at 49. Based on this evidence, the trial court reasoned as follows:

> The evidence thus demonstrates that Appellant entered into an agreement to help eliminate the eyewitness in Rannels'[s] murder case. Blackston and Armstead had originally made this agreement with Rannels over the recorded prison calls. When Blackston mistakenly identified [Decedent] as the eyewitness in Rannels'[s] case, Appellant instructed Blackston, Armstead, and Floyd to get some vehicles to begin following [Decedent]. According to Floyd, Appellant had been part of previous conversations about a witness who could identify Rannels. Accordingly, Appellant's conduct and the circumstances surrounding that conduct thus sufficiently indicated that he had also agreed to join the conspiracy to eliminate the eyewitness.

*Id*. at 49-50.

Furthermore, the trial court highlighted that Appellant committed other acts in furtherance of the conspiracy after the murder, which included agreeing with the co-defendants not to speak of the incident and making a prison call expressing his concern for being involved in the shooting. *Id*. at 50. The court finally concluded that despite the lack of evidence showing Appellant possessed or utilized a firearm, he was nonetheless guilty of third-degree murder "under a theory of conspiratorial liability." *Id*. at 51.

On review, we agree with the trial court that the evidence was sufficient to sustain both of Appellant's convictions. With respect to conspiracy, Appellant was not merely an unlucky bystander present during the shooting, as he claims. The testimony bore out that Appellant's cell phone number was specifically discussed by the co-defendants in the months before Rannels's preliminary hearing. Appellant conversed about the eyewitness to the murder

of Mr. Freeman with the co-defendants leading up to the initial encounter with Decedent and encouraged the others to get into the vehicles. He further stalked Decedent for hours and directly enabled the co-defendants to do the same, providing them updates as to Decedent's location. Finally, Appellant retreated to the residence of Armstead's sister afterwards and agreed with the co-defendants never to discuss the murder.

While the proof of Appellant's agreement to murder Decedent was circumstantial, it was not "so weak and inconclusive that, as a matter of law, no probability of fact may be drawn from the combined circumstances." **Roberts**, 293 A.3d at 1223. The jury was within its right to infer that Appellant conspired to eliminate Decedent as an eyewitness, despite his not being the gunman or even in possession of a firearm. It is additionally irrelevant that Appellant purports to have had no intent to kill Decedent. **See Fisher**, 80 A.3d at 1195 (stating that "the absence of intent to kill does not preclude a defendant from being convicted of conspiracy to commit third degree murder").

Furthermore, as the trial court correctly concluded, the evidence supports a verdict for third-degree murder, even though Appellant was not the gunman. While Blackston was the person who fired the rounds, the jurors could find that Appellant was nevertheless fully accountable for the killing pursuant to the doctrine of conspiratorial liability because Decedent's death was a "natural and probable consequence" of the conspiracy to eliminate an

eyewitness and was done in furtherance of its design. *See Geiger*, 944 A.2d at 91. In other words, assuming Appellant's assertion that he lacked possession of a firearm was true, this does not preclude his responsibility for the murder, especially in light of the evidence showing that the co-defendants sought to silence the witness to Mr. Freeman's slaying. Also, because the murder entailed stalking the victim for hours before fatally shooting him at close range, we have no difficulty in finding that the evidence demonstrated sufficient malice for a conviction. Appellant is therefore not entitled to relief on these claims.

In his third issue, Appellant argues that his convictions were against the weight of the evidence. The following law applies to our review of Appellant's claim:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.
>
> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court. Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa.Super. 2022) (cleaned up). Therefore, we must determine whether the trial court, in rejecting Appellant's challenge, "abused its discretion by reaching a manifestly unreasonable

judgment, misapplying the law, or basing its decision on partiality, prejudice, bias, or ill-will." *Commonwealth v. Clay*, 64 A.3d 1049, 1056 (Pa. 2013) (cleaned up).

As to this claim, Appellant reiterates that the Commonwealth's most potent evidence came from "an un-indicted co-conspirator with transactional immunity in exchange for testimony against the defendants." Appellant's brief at 35. He contends that because Floyd agreed to testify in order to save himself from charges, this rendered his testimony "tainted and unreliable." *Id*. Appellant also asserts that that the verdicts were against the weight of the evidence because there was no video surveillance showing Appellant getting into or out of the PT Cruiser, and that the cell phone location data was too broad to place Appellant precisely at the murder scene. *Id*. at 36.

In rejecting this contention, the trial court determined that "the testimony and evidence presented at trial was not so tenuous, vague and uncertain such that the jury's verdict shocked the conscience of th[e c]ourt." Trial Court Opinion, 8/15/23, at 33. It noted that the jury was properly instructed to consider and weigh the testimony of Floyd as a corrupt and polluted source, and that the law presumes the jury will follow this instruction. *Id*. at 33-36. The court also stated that there was additional evidence offered by the Commonwealth, beyond the testimony of Floyd, tying Appellant to the murder. In particular, the court cited the numerous jail calls between the co-defendants that identified Appellant's phone number, a subsequent interview

between police and the mother of Appellant's child that alluded to Floyd, Appellant's own jail recordings expressing concern that he would be caught, and the historical cell site analysis showing Appellant following Decedent for hours on the day of the murder. *Id*. at 37-38. The court was not persuaded by Appellant's argument that he could not be the driver of the PT Cruiser due to a lack of his fingerprints being on the vehicle, as law enforcement was not able to collect prints until roughly three months after the murder. *Id*. at 39. It also discounted the notion that there was no video showing Appellant driving the PT Cruiser because there was no evidence showing anyone else driving it, either. *Id*. at 39-40.

We cannot conclude that the trial court abused its discretion in denying Appellant's motion for a new trial. By all accounts, the court's analysis demonstrates that it considered the evidence admitted at trial in a manner that was not manifestly unreasonable or based upon "partiality, prejudice, bias, or ill-will." *Clay*, 42 A.3d at 1056. The court accounted for any purported weaknesses in the Commonwealth's case in deciding that it was not shocked by the jury's verdict. Accordingly, Appellant is not entitled to a new trial on this basis.

In his fourth claim, Appellant maintains that his verdicts were inconsistent, and therefore against the weight of the evidence. *See* Appellant's brief at 37-38. In advancing this position, he avers that this is because the remaining co-defendants were all convicted of first-degree

murder and conspiracy to commit the same, whereas Appellant was only found guilty of charges relating to third-degree murder. *Id*. at 37-38. Accordingly, Appellant argues that "[he] could not have conspired with co-defendants who acted intentionally whereas [he] did not act intentionally. There was no meeting of the criminal minds." *Id*. at 38.

Although couched as a weight of the evidence claim, Appellant's argument actually invokes the abrogated common law rule of consistency, which required consistent verdicts as to co-conspirators.[2] ***See Commonwealth v. Fremd***, 860 A.2d 515, 521 (Pa.Super. 2004) (concluding that the rule of consistency "has basically been overruled by" prior cases decided by both the Pennsylvania Superior and Supreme Courts).

In ***Commonwealth v. Campbell***, 651 A.2d 1096, n.2 (Pa. 1994), our Supreme Court rejected application of this rule in the scenario where Campbell

_____

[2] As our High Court has noted:

> The development of the rule of consistency was a product of the pre-twentieth century English system of appellate review. Prior to 1907, a criminal defendant could only seek review by a writ of error, which was limited to the arraignment, the plea, the issue and the verdict. Because the evidence presented at trial was not reviewable, a jury's inconsistent verdict in a conspiracy trial of two or more defendants was incapable of review upon sufficiency of evidence grounds. Thus[,] as a way to protect the criminal defendant against jury prejudice or misapplication of the law, the conspiracy rule of consistency developed.

***Commonwealth v. Campbell***, 651 A.2d 1096, 1098 n. 2 (Pa. 1994) (citation omitted).

was convicted of conspiracy to sell drugs following a joint trial, whereas the only other co-defendant was acquitted. In determining that Appellant was not entitled to relief on appeal, the Court stated that "consistency in verdicts in a joint trial for conspiracy is not necessarily required." *Id*. at 1099. Rather, "the acquittal of the sole alleged co-conspirator does not *per se* preclude the conviction of the remaining defendant, even if the defendants are jointly tried," so long as the record supports the apparently inconsistent verdict. *Id*. The *Campbell* Court's conclusion was based in part on the longstanding principles that (1) a jury may make an inconsistent decision based on compromise or leniency, and (2) consistency in verdicts should not be required because it would entail "inquiries into jury's deliberations that courts generally will not make." *Id*. at 1100 (discussing *United States v. Powell*, 469 U.S. 57 (1984)).

We readily dispose of Appellant's claim here because, as discussed *supra*, the evidence introduced at trial supported both of Appellant's convictions. Even if we were to agree with Appellant that his convictions were inconsistent with the verdicts rendered as to the co-defendants, his assertion that he is entitled to a new trial because of this cannot succeed. In light of our High Court's decision in *Campbell*, an inconsistent verdict as between jointly tried co-defendants is simply not grounds for a new trial when the convictions are otherwise supported by the evidence. No relief is due.

In his fifth issue, Appellant argues that the court erred in denying his motion for a mistrial based on alleged prosecutorial misconduct, arising from the fact that Detective Verrecchio informed the jury that Appellant was incarcerated, albeit for reasons unrelated to the underlying charges. ***See*** Appellant's brief at 42-45.

> A motion for a mistrial is within the discretion of the trial court. A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. On appeal, our standard of review is whether the trial court abused that discretion.

***Commonwealth v. Bennett***, 225 A.3d 883, 890 (Pa.Super. 2019) (citation omitted).

In discussing this issue, the trial court opined, *inter alia*, that a mistrial was not warranted because any alleged prejudice was ameliorated when it provided an instruction to the jury "not to consider or make any adverse or negative inference to any defendant being in custody." Trial Court Opinion, 8/15/23, at 55 (citing N.T. Trial, 3/25/22, at 138). Appellant does not directly address this contention in his brief, instead baldly asserting that "there was no way to sanitize prison calls except through minimizing attention to [A]ppellant's incarceration. Disclosing his incarceration . . . hardened the blow." Appellant's brief at 45.

We conclude that the trial court did not abuse its discretion in denying Appellant's request for a mistrial. Assuming that this issue was preserved for

our appeal despite Appellant's failure to timely object, it merits him no relief. "It is well-settled that jurors are presumed to follow the trial court's cautionary instructions." *Commonwealth v. Goods*, 265 A.3d 662, 672 (Pa.Super. 2021) (citation omitted). After the collective reference from the prosecutor and Detective Verrechio that Appellant was in jail for charges unrelated to this case, the court informed the jury that it was not to consider the fact that Appellant was incarcerated. Appellant has not convinced us through any argument or citation to pertinent law that the instruction given by the trial court was insufficient to cure any prejudice arising therefrom. This is especially true as, in this instance, the reference arose in the context of discussing Appellant's jail calls, which by necessity communicated to the jury that he was behind bars when they were made. Thus, the remark concerning Appellant being incarcerated was not "of such a nature that its unavoidable effect is to deprive" Appellant of a "fair and impartial trial." *Bennett*, 225 A.3d at 890.

In his final issue, Appellant challenges the length of his aggregate sentence. The following legal principles guide our determination of whether the claim is properly before us:

> [A]n appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction. We determine whether the appellant has invoked our jurisdiction by considering the following four factors: (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there

is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Solomon*, 247 A.3d 1163, 1167 (Pa.Super. 2021) (*en banc*) (cleaned up). In addressing whether a defendant has presented a substantial question, "[o]ur inquiry must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." *Commonwealth v. Rhoades*, 8 A.3d 912, 616 (Pa.Super. 2010) (cleaned up).

Here, Appellant timely appealed and preserved this issue in his post-sentence motion. He also included a Pa.R.A.P. 2119(f) statement in his brief, asserting that he raised a substantial question because "the term of confinement was more than necessary, and the consecutive nature of the sentence was excessive, especially since [A]ppellant was deemed the least culpable of all defendants . . . and the trial court seemed not to consider the tremendous mitigating factors, and his need for and potential for rehabilitation." Appellant's brief at 26. This constitutes a substantial question for our review. *See Commonwealth v. Raven*, 97 A.3d 1244, 1253 (Pa.Super. 2014) ("[A]n excessive sentence claim—in conjunction with an assertion that the court failed to consider mitigating factors—raises a substantial question.").

Turning to the merits of Appellant's challenge, our standard of review is as follows:

> Appellant must demonstrate that the sentencing court abused its discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, Appellant must establish,

- 18 -

by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Solomon*, 247 A.3d at 1168 (cleaned up). Furthermore, "[w]here the trial court is informed by a [pre-sentence investigation ("PSI") report], it is presumed that the court is aware of all appropriate sentencing factors and considerations, and that where the court has been so informed, its discretion should not be disturbed." *Commonwealth v. Torres*, 303 A.3d 1058, 1065 (Pa.Super. 2023) (cleaned up).

A trial court's sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). "When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." *Commonwealth v. Taylor*, 277 A.3d 577, 593 (Pa.Super. 2022) (cleaned up).

Appellant argues that "[t]he sentencing court abused [the] discretionary aspects of sentencing and completely discounted and ignored mitigating factors that are mandated to be considered by the Sentencing Code, while entering a consecutive in nature sentence." Appellant's brief at 29. He contends that the court condemned him to a *de facto* life sentence and treated his conviction for third-degree murder as akin to a conviction for first-degree

- 19 -

murder, as with the co-defendants. *Id*. at 29, 32-33. Appellant further maintains that the sentence was unduly punitive because "[A]ppellant was deemed by the jury the least culpable of the defendants, showed great remorse at sentencing, and is in need of rehabilitation." *Id*. at 30. He highlights that he had a prior record score of zero, and that a standard guideline sentence could have been as low as six years per charge, far shorter than the aggregate of thirty to eighty years he received. *Id*. at 31.

In its Rule 1925(a) opinion, the trial court noted that the sentences imposed fell within the standard range of the sentencing guidelines. *See* Trial Court Opinion, 8/15/23, at 28. It further stated that it considered the PSI report, which indicated that Appellant had engaged in additional criminal acts in the years between the murder and when he was charged. *Id*. at 30. The court also highlighted that Appellant's sentence was lighter than those received by the co-defendants, which reflects the fact that the jury found him to be less culpable. *Id*. Ultimately, it recounted the following reasons that it stated on the record for Appellant's sentence:

> This case on many levels is very, very disturbing. [Decedent] was thought to be a witness in a homicide, but he wasn't. Now, even if he was, it doesn't make it any better, but it is even more - I don't know how to put it exactly - outrageous that a person who had nothing to do with this case, but looked like the witness, wound up getting stalked and killed.
>
> Appellant was one of [the] people involved, but he was not convicted of first-degree murder, because the jury saw his involvement as different than the other three defendants, who are and should be serving life. The question is what's the appropriate sentence here. I'm also concerned about Appellant's actions

afterwards; not because they reflect on the guidelines, but just the criminal conduct.

I understand what Appellant's counsel is saying about people who are [eighteen] and they do things that people when they're [thirty] wouldn't and the whole situation with juvenile lifers and everything else, but [Appellant's] criminal conduct did continue after this incident, which was not resolved for -- I think -- almost six or seven years with an arrest.

There is absolutely nothing we can do to bring [Decedent] back or to change what you're going through or will go through, and I also understand what [Decedent's] widow is saying. We're just the [c]ourt here. We're not the heavenly court. We're not the ultimate justice. We are just on earth trying to do justice as we can under the system that has been created in our democracy.

What I think is appropriate here is the following sentence, which will give [Appellant] an opportunity, potentially, to come out, but under proper supervision. I'm taking into account the factors of why this killing occurred and [Appellant's] conduct afterwards, but not as to a prior record score, and the facts and circumstances of how the killing occurred, as well.

*Id*. at 28-29 (citing N.T. Sentencing, 9/22/22, at 30-32).

The certified record leads us to conclude that the trial court did not abuse its discretion in sentencing Appellant to an aggregate thirty to eighty years in prison. Based on the reasons it articulated at sentencing, the court correctly noted that while Appellant had a prior record score of zero, he nonetheless continued to engage in criminal activity for years before he was arrested for this crime. This undercuts Appellant's assertion that the sentence was unduly punitive or that Appellant was a strong candidate for rehabilitation. The court was also clearly cognizant of the jury's finding that Appellant was less culpable than the co-defendants, which is shown by a sentence that gives Appellant hope of parole during his lifetime. Finally, as the court had access

to a PSI report, we further presume that it was "aware of all appropriate sentencing factors and considerations." ***Torres***, 303 A.3d at 1065.

In sum, since none of the issued raised by Appellant warrants relief, we have no cause to disturb his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/18/2024